**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-2694
_____

GOVERNMENT OF THE VIRGIN ISLANDS

v.

KWANZA MARTINEZ,

Appellant
_____

On Appeal from the District Court
of the Virgin Islands, Appellate Division
(Crim. No. 1:04-cr-00148-1)
Judges:  Hon. Curtis V. Gomez, Hon. Raymond L. Finch,
and Hon. Audrey L. Thomas

Submitted Under Third Circuit LAR 34.1(a)
May 4, 2010
_____

Before:  SMITH, CHAGARES, and JORDAN, <u>Circuit</u> <u>Judges</u>.

(Filed: September 8, 2010)

Martial A Webster, Sr., Esq.
116 Queen Cross Street
Frederiksted, St. Croix, V.I. 00851
        <u>Counsel for Appellant</u>

Tiffany V. Robinson, Esq.
Office of the Attorney General of the Virgin Islands
34-38 Kronprindsens Gade, GERS Complex, 2nd Floor
Charlotte Amalie, St. Thomas, VI 00802
        <u>Counsel for Appellee</u>

_____

OPINION

_____

CHAGARES, <u>Circuit</u> <u>Judge</u>.

Kwanza Martinez was convicted in the Territorial Court of the Virgin Islands of kidnapping for rape, and he was sentenced to thirty years in prison. The Appellate Division of the District Court of the Virgin Islands affirmed the conviction. Three months later, Martinez filed a notice of appeal in this Court. Concluding that the Government has forfeited its ability to attack the appeal as untimely pursuant to Federal Rule of Appellate Procedure 4(b), we exercise jurisdiction. Because we reject Martinez's claims on the merits, we will affirm the order of the Appellate Division.

I.

Taken in the light most favorable to the Government, the pertinent facts are as follows. On the night of June 16, 2003, Chenae Harvey, who was then sixteen, left her home in the Harbor View housing community on the island of St. Croix. In a nearby parking lot, she bumped into Martinez, her first cousin, who was then twenty-one. Harvey entered Martinez's car voluntarily, expecting that he would drive her to her friend Amanda's apartment, also located in Harbor View. Instead, Martinez unexpectedly passed Amanda's apartment at a high rate of speed, and Harvey quickly realized that he did not intend to take her there. Harvey asked Martinez where he was taking her, but he did not answer. She twice asked him to take her home, but again he was unresponsive. When they reached the Princesse area, Harvey began to cry, and screamed to Martinez that she wanted to go home. Yet again, he did not respond. Finally, Harvey grabbed the steering wheel in an attempt to stop the car. At that point, Martinez ordered Harvey not to grab the wheel, and said that he had a gun in the car and did not want to be stopped by the police. Martinez then removed a firearm from the glove compartment and placed it in his lap. The gun remained present for the duration of the encounter.

Martinez's excessive speed caused Harvey to be "afraid [for her] life." Joint Appendix ("JA") 152. He continued his frenetic pace until he reached a desolate area past the Salt River, 10.8 miles from Harbor View. Martinez drove up a steep hill known as "The Beast," turned the car around at a dead end so that it faced down the hill, and turned off the lights. With the gun still in his lap, Martinez then demanded that Harvey have sex with him. She declined, stating, "No, I don't want to have sex with you because you is my cousin." Id. When she did not acquiesce, Martinez ordered Harvey out of the car and sped away.

Five minutes later, Martinez returned, at which time Harvey opened the rear passenger door and reentered the car. It is undisputed that at some point thereafter, Martinez and Harvey engaged in sexual intercourse. The nature of the sexual encounter, however, is vigorously disputed: Martinez claimed that it was consensual, and Harvey alleged that it was not. In any event, whatever happened in fact is not critical to resolution of this appeal.

The record is not entirely clear how long the episode lasted, but it appears to have taken place over a period of about an hour. Two days later, Harvey told her mother, Faye Martinez (who is the defendant's aunt), about the incident, and her mother then took her to the hospital. Harvey gave a statement to police officers at the hospital, after which the officers recovered her undergarments. Analysis on the clothing tested positive for DNA consistent with Martinez's.

Martinez was arrested on July 9, 2003, and was charged in a six-count criminal information with aggravated rape in the first degree (in violation of V.I. Code Ann. tit. 14, § 1700); aggravated rape in the second degree (in violation of V.I. Code Ann. tit. 14, § 1700a); kidnapping for rape (in violation of V.I. Code Ann. tit. 14, § 1052(b)); two counts of unlawful sexual contact in the first degree (in violation of V.I. Code Ann. tit. 14, § 1708); and possession of a deadly weapon during a crime of violence (in violation of V.I. Code Ann. tit. 14, § 2251(a)). Martinez did not dispute that he had sexual intercourse with Harvey, but claimed that the encounter had been entirely consensual. After a three-day

3

trial, the jury convicted him of kidnapping for rape (Count Three), but acquitted him of the other charges.[1] The trial court sentenced him to thirty years in prison. The Appellate Division affirmed the conviction, and this appeal followed.

## II.

We first consider our jurisdiction. The Appellate Division exercised appellate jurisdiction under 48 U.S.C. § 1613a(a), and entered its order affirming the conviction on February 27, 2008. On May 20, 2008, the Appellate Division entered on its docket a handwritten letter from Martinez, dated May 15, 2008, in which he averred that he had only recently learned that his conviction had been affirmed. He explained that his attorney had been disbarred and had not forwarded him a copy of the Appellate Division's opinion and order. The court appointed new counsel, who filed a notice of appeal on June 10, 2008, 104 days after entry of the Appellate Division's final order.

On June 17, 2008, the Clerk of this Court issued an order (1) advising the parties that we may lack appellate jurisdiction, and (2) directing them to file responses addressing the issue. The Government did not file a response (and has never addressed the jurisdictional issue in this Court); Martinez filed a response through counsel. A motions panel thereafter referred the issue to this merits panel to consider whether the time limitation in Federal Rule of Appellate Procedure 4(b) is a jurisdictional requirement, or a claim-processing rule subject to forfeiture.

"The Federal Rules of Appellate Procedure govern appeals to our [C]ourt from the District Court of the Virgin Islands[, Appellate Division]. Therefore, the time limits for the filing of a notice of appeal in a criminal case are those set out in Fed. R. App. P. 4(b)." Gov't of the V.I. v. Charleswell, 24 F.3d 571, 575 (3d Cir. 1994) (citation and footnote omitted). Rule 4(b) required Martinez to file a notice of appeal within ten days of the entry of

---

[1] Before the case was submitted to the jury, the trial court dismissed the charge of aggravated rape in the second degree.

4

the Appellate Division's final order.[2]  It is undisputed that he did not do so.  Our decisions have repeatedly noted that the failure to file a timely notice of appeal in a criminal case deprives us of appellate jurisdiction.  See, e.g., United States v. Carelock, 459 F.3d 437, 440-43 (3d Cir. 2006); United States v. Kress, 944 F.2d 155, 161 (3d Cir. 1991); United States v. Vastola, 899 F.2d 211, 220 (3d Cir.), vacated on other grounds, 497 U.S. 1001 (1990); United States v. Grana, 864 F.2d 312, 314 (3d Cir. 1989).

While a panel of our Court is bound by the precedential decisions of earlier panels, that rule does not apply "when the prior decision[s] conflict[] with a Supreme Court decision."  United States v. Tann, 577 F.3d 533, 541 (3d Cir. 2009); see also United States v. Singletary, 268 F.3d 196, 202 (3d Cir. 2001); Third Circuit Internal Operating Procedure 9.1.  Three recent Supreme Court decisions compel us to revise our prior jurisdictional view of Rule 4(b):  Kontrick v. Ryan, 540 U.S. 443 (2004); Eberhart v. United States, 546 U.S. 12 (2005) (per curiam); and Bowles v. Russell, 551 U.S. 205 (2007).  In accordance with the uniform holdings of our sister courts of appeals following these decisions,[3] we now hold that Rule 4(b) is not jurisdictional and is subject to forfeiture.

In Kontrick, the Supreme Court held that Federal Rule of Bankruptcy Procedure 4004 – which sets forth a sixty-day window for a creditor to file a complaint objecting to a debtor's discharge – is not jurisdictional.  540 U.S. at 447.  The Court explained that

---

[2] Rule 4(b) now prescribes a fourteen-day window to file a notice of appeal in a criminal case.  Fed. R. App. P. 4(b).

[3] See, e.g., United States v. Neff, 598 F.3d 320, 323 (7th Cir. 2010); United States v. Urutyan, 564 F.3d 679, 685 (4th Cir. 2009); United States v. Lopez, 562 F.3d 1309, 1313 (11th Cir. 2009); United States v. Byfield, 522 F.3d 400, 403 n.2 (D.C. Cir. 2008); United States v. Frias, 521 F.3d 229, 233 (2d Cir.), cert. denied, 129 S. Ct. 289 (2008); United States v. Garduno, 506 F.3d 1287, 1290-91 (10th Cir. 2007); United States v. Martinez, 496 F.3d 387, 388-89 (5th Cir. 2007) (per curiam); United States v. Sadler, 480 F.3d 932, 934 (9th Cir. 2007).

the term "jurisdictional" properly applies only to "prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction)" implicating "a court's adjudicatory authority." Id. at 455. With respect to the former, the Court emphasized, "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction." Id. at 452 (citing U.S. Const. art. III, § 1).

Though other bankruptcy-related time constraints appear in the judicial code, the Court noted that the specific statutory "provision conferring jurisdiction over objections to discharge . . . contains no timeliness condition." Id. at 453. Instead, the time limitation governing objections to discharge is governed solely by Rule 4004, a court-prescribed rule established for the "practice and procedure" in bankruptcy actions. Id. The Court recognized that it and other courts had been "less than meticulous" in distinguishing between statutory provisions circumscribing a court's authority to hear a case and "emphatic time prescriptions in rules of court." Id. at 454. Clarifying the distinction, the Court explained that while "subject-matter jurisdiction cannot be expanded to account for the parties' litigation conduct[,] a claim-processing rule, . . . even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point." Id. Because the debtor there had not raised the objector's untimeliness until after the objection had been litigated on the merits, the Court held that the argument had been forfeited and that jurisdiction had been properly exercised.

In Eberhart, the Court, relying on Kontrick, held that Federal Rule of Criminal Procedure 33 – which at the time gave a criminal defendant seven days to file a motion for a new trial – is not jurisdictional. 546 U.S. at 13. Rejecting the notion that court-prescribed rules by themselves provide the "keys to the kingdom of subject-matter jurisdiction," id. at 17, the Court explained that Rule 4004 and Rule 33(a) are "virtually identical provisions." Id. at 16. The Court concluded that the latter, like the former, is a rigid claim-processing rule, but one whose protection is subject to forfeiture if not properly invoked.

6

Finally, in Bowles, the Supreme Court held that Federal Rule of Appellate Procedure 4(a)(6) – which governs a district court's authority to extend the time to appeal in civil cases – is jurisdictional. 551 U.S. at 213. Though the Court stated generally that "time limits for filing a notice of appeal are jurisdictional in nature," id. at 206, it repeatedly grounded its holding on "the jurisdictional significance of the fact that a time limitation is set forth in a statute." Id. at 210 (emphasis added); see also id. (stating that Kontrick, Eberhart, and other cases had not "call[ed] into question our longstanding treatment of statutory time limits for taking an appeal as jurisdictional." (emphasis added)); id. at 211-12 (noting the "jurisdictional distinction between court-promulgated rules and limits enacted by Congress"); Lizardo v. United States, __ F.3d __, __, No. 08-2044, 2010 U.S. App. LEXIS 16489, at *9 (3d Cir. Aug. 10, 2010) ("The Bowles Court explained that time limits that are not based on a statute . . . are not jurisdictional rules, but claim-processing rules.").

Because 28 U.S.C. § 2107 prescribes time limits for filing a civil appeal – and because the constraints imposed by Rule 4(a)(6) are also required by the statute – the Bowles Court concluded that the time to file a notice of appeal in a civil case and the statutory provisions governing extensions of that time limit are jurisdictional. Notably, the Court bolstered its holding by contrasting Rule 4(a) with its criminal counterpart: "we have treated the rule-based time limit for criminal cases differently, stating that it may be waived because the procedural rules adopted by the Court for the orderly transaction of its business are not jurisdictional . . . ." 551 U.S. at 212 (quotation marks omitted); see also Lizardo, __F.3d at __, 2010 U.S. App. LEXIS 16489, at *10 (noting the Bowles Court's distinction between the rules governing civil and criminal appeals).

Until 1948, the deadline to file a notice of appeal in both civil and criminal cases was prescribed by 28 U.S.C. § 2107. See United States v. Frias, 521 F.3d 229, 233 (2d Cir.), cert. denied, 129 S. Ct. 289 (2008). Since then, however, § 2107 – together with Rule 4(a) – has governed only the deadline to appeal in civil cases. Rule 4(b), by contrast, has governed the time to file a notice of

7

appeal in criminal cases since 1968 – absent statutory mandate.[4] Because Rule 4(b) is not grounded in statute, therefore, we are not deprived of appellate jurisdiction if a party fails to invoke the rule properly upon an untimely notice of appeal.[5]

We repeat that Rule 4(b)'s deadline is rigid. Upon proper invocation of the rule when a notice of appeal is filed out of time, we must dismiss the appeal. In this case, however, the Government has never invoked Rule 4(b). It did not respond to the Clerk's order directing it to advise us on its position, and it did not mention the issue in its merits brief. Because the Government has clearly forfeited the untimeliness argument available to it, we exercise jurisdiction.[6] We do so pursuant to 48 U.S.C. § 1613a(c).

---

[4] Federal Rule of Criminal Procedure 33 governed the time to file a notice of appeal in criminal cases from 1948 to 1968.

[5] In United States v. Carelock – decided before Bowles but after Kontrick and Eberhart – we held that an appellant's failure to file a notice of appeal compliant with Rule 3(c) (governing the contents of a notice of appeal) deprived us of jurisdiction. 459 F.3d at 441-43. By the time a proper notice of appeal had been filed, Rule 4(b)'s deadline had run. Id. at 443. In a footnote, we identified the issue that Kontrick and Eberhart raised with respect to Rule 4(b). Id. at 440 n.6. We noted in dicta that "the language and commentary of the rules, along with their prior treatment by the Supreme Court and this Court, strongly support the conclusion that Rules 3 and 4 govern subject-matter jurisdiction." Id. But because the Government had raised a proper objection to the non-compliant notice of appeal, we did not answer the question at that time. Id. In light of Bowles and the holdings of our sister circuits, we believe it is clear that Rule 4(b) can no longer be considered a jurisdictional limitation. Because it is not before us, we need not consider the jurisdictional implications of Rule 3(c).

[6] It remains an open question whether this Court may invoke Rule 4(b)'s time limit sua sponte and dismiss an untimely criminal appeal absent a motion by a party. See Frias, 521 F.3d at 234 n.5 (declining to answer the question). At least one other court of appeals has answered that question affirmatively, retaining

III.

Martinez argues that the evidence is insufficient to sustain the kidnapping for rape conviction under V.I. Code Ann. tit. 14, § 1052(b). We exercise plenary review over Martinez's sufficiency challenge, United States v. Bornman, 559 F.3d 150, 152 (3d Cir. 2009), yet that review is narrow. United States v. Rawlins, 606 F.3d 73, 80 (3d Cir. 2010). We will accept the jury's verdict if, viewing the evidence in the light most favorable to the Government, "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in Jackson). "[W]e examine the totality of the evidence, both direct and circumstantial, and must credit all available inferences in favor of the [G]overnment." United States v. Sparrow, 371 F.3d 851, 852 (3d Cir. 2004) (quotation marks omitted).

Section 1052(b) of the Virgin Islands Code provides in its entirety:

> Whoever abducts, takes or carries away any person by force or threat with the intent to commit rape is guilty of kidnapping and shall be imprisoned for not less than 15 years and shall not be eligible for parole until he has served at least one-half of [the] sentence imposed.

discretion to invoke the rule "when judicial resources and administration are . . . implicated and the delay has . . . been inordinate." United States v. Mitchell, 518 F.3d 740, 750 (10th Cir. 2008); see also id. at 752-55 (Lucero, J., dissenting) (agreeing that courts of appeals have discretion to dismiss an untimely appeal when an appellee fails to invoke Rule 4(b), but disagreeing that such discretion should be so narrowly circumscribed). We leave this question for another day.

9

V.I. Code Ann. tit. 14, § 1052(b). Section 1052(b) required the Government to prove beyond a reasonable doubt: (1) that Martinez abducted, took, or carried away Harvey against her will; (2) that he did so by force or threat; and (3) that he intended to commit rape while doing so.[7] With respect to the kidnapping component of the crime, we must consider (1) the duration and distance of asportation of the victim, and (2) whether the asportation created a significant danger to the victim independent of that posed by a separate ongoing offense. Gov't of the V.I. v. Ventura, 775 F.2d 92, 96-98 (3d Cir. 1985) (modifying four-factor test set forth in Gov't of the V.I. v. Berry, 604 F.2d 221, 227 (3d Cir. 1979)).[8]

---

[7] The Virgin Islands Code specifies several classes of rape. Aside from the independent offenses of unlawful sexual contact in the first and second degrees, see V.I. Code Ann. tit. 14, §§ 1708-09, the Code delineates the crimes of rape in the first, second, and third degrees, and aggravated rape in the first and second degrees. See V.I. Code Ann. tit. 14, §§ 1700-03. But § 1052(b) does not specify which version of rape a defendant must intend to commit during a kidnapping to violate the statute. We can readily discern the answer. The statute does not require a defendant to intend to commit aggravated rape, for it plainly says only "intent to commit rape." Conversely, the crimes of rape in the second and third degrees are statutory-rape prohibitions, in which the crime is defined based on the respective ages of the perpetrator and the victim, not on the perpetrator's intent or the victim's consent. See Gov't of the V.I. v. Richards, 44 V.I. 47, 55 (Terr. Ct. 2001). Accordingly, we believe it is it clear that § 1052(b) requires the Government to prove that the defendant intended to commit (at least) rape in the first degree. Relevant here, such a crime occurs when a defendant engages in sexual intercourse or sodomy with another "when the [victim's] resistance is forcibly overcome." V.I. Code Ann. tit. 14, § 1701(2).

[8] In Berry, we interpreted § 1052 (then a general kidnapping statute) narrowly to preclude its "overzealous enforcement . . . [against] persons who have committed such substantive crimes as robbery or assault[, and] which inherently involve the temporary detention or seizure of the victim . . . ." 604 F.2d at 226. Lest those defendants be punished for kidnapping when "in reality

10

Martinez first argues that because Harvey entered the car voluntarily at the Harbor View parking lot, the evidence was insufficient to prove that he took her away against her will. We disagree. No language exists in § 1052(b) that would absolve the abduction of an unconsenting victim merely because the victim's initial interaction with the perpetrator was voluntary. We hold – as have the majority of courts considering similar proposed interpretations of the federal kidnapping statutes – that § 1052(b) reaches the abduction of an individual during an otherwise consensual encounter if consent is withdrawn at some point after the encounter commences.[9] Harvey's testimony that she several

_____

[they] committed lesser or different offenses, of which temporary seizure or detention played an incidental part," id., we set forth four factors to determine whether a defendant was guilty of the separate crime of kidnapping: (1) the duration and distance of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense. Id. at 227. After we decided Berry, the Virgin Islands legislature added § 1052(b), ultimately prompting our decision in Ventura. There, we explained that by enacting the kidnapping-for-rape statute, "the legislature was not concerned, as was the Berry court, about the risk of over-zealous application of the kidnapping charge to impose a sentence substantially greater than that attached to the underlying crime." 775 F.3d at 96. We held that while the statutory amendment marginalized the second and third Berry factors, the first and fourth factors remained applicable to § 1052(b). Id. at 97-98. We emphasized, however, that "the modified Berry test used in § 1052(b) cases is not a stringent one." Id. at 98 n.12. Here, Martinez argues that Berry compels reversal of his conviction. He ignores Ventura entirely. In this opinion, we refer to the "first" and "second" Ventura factors, which are synonymous with the first and fourth Berry factors.

[9] See, e.g., United States v. Tian, 339 F.3d 143, 152 (2d Cir. 2003) ("The Hostage Taking Act . . . does not require that a seizure

11

times pleaded with Martinez to take her home easily supported the jury's finding that she had been detained against her will during the car ride.

Martinez next argues that the evidence was insufficient to sustain the element that force or threat be used to carry out the kidnapping. We disagree. Harvey's testimony that Martinez brandished the gun in the car (where it remained on his lap for the duration of the ride) was sufficient to permit the jury to find that Martinez detained Harvey by force or threat. Introduction of the gun into the equation stopped Harvey's attempt to grab the steering wheel instantly. Alternatively, immediately before Martinez actually brandished the gun, he ordered Harvey not to grab the steering wheel because he had a gun and did not want to be stopped by the police. This threat alone established the element of force or threat, whether the gun itself was ever introduced or not. See United States v. Macklin, 671 F.2d 60, 64 (2d Cir. 1982) (noting that a kidnapping offense requires a defendant to use "some means of force – actual or threatened, physical or mental – . . . so that the victim is taken, held and transported against his or her will"

_____

or detention be against a hostage's will from its inception."); United States v. Carrion-Caliz, 944 F.2d 220, 226 (5th Cir. 1991) ("The dispositive question is not whether [the hostages] initially agreed to go to [the hostage taker's] house, but rather whether [the hostages] later were detained or confined there against their will."); United States v. Eagle Thunder, 893 F.2d 950, 952 (8th Cir. 1990) ("Even if [the victim] had initially consented to accompanying [the defendant in his car], that fact would not prevent the occurrence of a kidnapping because [the defendant] thereafter detained [the victim] despite her repeated requests to be taken home or to her mother."); United States v. Redmond, 803 F.2d 438, 439 (9th Cir. 1986) ("The fact that one originally accompanies another without being forced does not prevent the occurrence of a kidnapping where force is later used to seize or confine the victim."); United States v. McBryar, 553 F.2d 433, 434 (5th Cir. 1977) (per curiam) (kidnapping conviction upheld where defendant agreed to take victim to one destination but drove in opposite direction and refused her requests to be let out of automobile).

(emphasis added)).

Martinez next argues that any asportation in this case was "minimal." We disagree. The evidence readily established the first Ventura factor (distance or duration of the asportation). Martinez transported Harvey 10.8 miles from Harbor View to the secluded area where the sexual encounter occurred, and the entire episode appears to have lasted about an hour. This is plainly sufficient. See Gov't of the V.I. v. Alment, 820 F.2d 635, 638 (3d Cir. 1987) (concluding that evidence of asportation from "one environment . . . to another" over a distance of approximately seventy feet was sufficient); Ventura, 775 F.2d at 98 (explaining that dragging victim indoors, over a period of several minutes and for a distance of eighty-eight feet was sufficient degree of asportation under the less-stringent modified Berry framework).

Martinez also claims that "no evidence regarding [independent] significant danger was ever presented at trial." Martinez Br. at 19. We disagree. The second Ventura factor was satisfied by testimony regarding: (1) Martinez's reckless driving en route to the Salt River area; (2) the presence of the firearm throughout the episode; and (3) the fact that the alleged kidnapping occurred several minutes before the sexual encounter itself. See Ventura, 775 F.2d at 98 (explaining that harm of being dragged "through the bushes by the ear while [the defendant was] carrying a gun" is significant danger, and independent of the rape committed). The threat posed by the firearm and Martinez's driving clearly presented a danger independent of any harm posed by the alleged sexual assault.

Finally, Martinez argues that the evidence was insufficient to establish that he formed the specific intent to commit rape during the asportation because the acquittal on the rape charge removes any possible inference that he had formed the intent to commit rape at an antecedent moment. We disagree. As an initial matter, even accepting for the moment that the jury acquitted Martinez of rape because it determined that the sexual intercourse was consensual, we reject the underlying premise of the claim. There is no logical or temporal inconsistency between a finding that Martinez intended to rape Harvey at one point in time, and a finding that Harvey

13

nevertheless acquiesced to Martinez's sexual advances several minutes later.

In any event, Martinez appears to argue that, having found the sexual act voluntary as to the rape charge, the jury was not permitted to use Harvey's testimony about that act in determining his earlier intent as to the kidnapping charge. Again we disagree. Each count of the criminal information was independent of the next; the jury was permitted – indeed, required – to assess all of the evidence as it pertained to each individual count. Hypothesizing about contradictory jury verdicts does not afford a basis for reversing a conviction on sufficiency-of-the-evidence review. See United States v. Powell, 469 U.S. 57, 62 (1984) (reaffirming that "[c]onsistency in the verdict is not necessary" (quoting Dunn v. United States, 284 U.S. 390, 393 (1932))); United States v. Mussare, 405 F.3d 161, 167 (3d Cir. 2005) ("[T]here is no requirement that a jury's verdict be consistent.").

If, as Martinez presumes, the jury determined that the sexual act was consensual as it considered the rape charge, it was not beholden to that conclusion when it considered the kidnapping charge. We, in turn, may not reverse purely because the jury's resolution of the historical facts might seem inconsistent:

> [A] criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt. We do not believe that further safeguards

14

against jury irrationality are necessary.

Powell, 469 U.S. at 67 (emphasis added, citations omitted); see also United States v. Alicea, 205 F.3d 480, 484 (1st Cir. 2000) ("In a single, multi-count trial, acquittal on one or more counts does not preclude conviction on other counts based upon the same evidence, as long as that evidence is legally sufficient to support a finding of guilt on the count(s) of conviction." (emphasis added)); United States v. Church, 955 F.2d 688, 695 (11th Cir. 1992).

Thus, while the jury found that the Government had not proved the crimes of aggravated rape and unlawful sexual contact beyond a reasonable doubt, it was free to use Harvey's testimony that Martinez raped her when considering whether he had formed the specific intent to rape at an earlier point in time. See United States v. Sriyuth, 98 F.3d 739, 747 (3d Cir. 1996) (holding evidence of sexual assault relevant to show defendant's motive in kidnapping victim); United States v. Bradshaw, 690 F.2d 704, 708 (9th Cir. 1982) ("This Court has previously held evidence of sexual relations admissible because of its relevance to motive in a kidnapping case."). In sum, the jury's acquittal on the other counts "is irrelevant to our singular focus on and determination of whether the evidence adduced at trial supports" the conviction on Count Three. United States v. Veal, 153 F.3d 1233, 1253 (11th Cir. 1998).[10]

Viewing all of the evidence in the light most favorable to the Government, we conclude that it was sufficient to support a finding that Martinez possessed an intent to rape Harvey during the car ride. Within a span of several minutes, Martinez took Harvey against her will to a secluded area, brandished a firearm and threatened her in doing so, immediately demanded that she have sex with him (a demand she refused), whereupon he ordered her out of the car before driving away. Additionally, Dawn Callwood,

---

[10] Similarly, although it acquitted Martinez of unlawful possession of a deadly weapon during a crime of violence, the jury was entitled to accept Harvey's testimony that Martinez used a gun to carry out the kidnapping.

15

Martinez's unrelated "aunt," testified that some time after the incident, Martinez called her and admitted that "something just happened . . . [s]omething just came over him. . . . [S]omething just popped . . . just went pop in his head." JA 116. Callwood also testified that Martinez attempted to "justify himself" to her, id., and that he admitted that "something happened to Chenae." JA 117. Corroborating this account was Faye Martinez's testimony that the defendant called her after the incident and, "sound[ing] very afraid," said that he knew Harvey's father and uncle were looking for him, but that it was "not going to go down like that." JA 217.

Drawing all reasonable inferences in the Government's favor, the evidence surrounding the sexual encounter, along with Martinez's own statements and the evidence of his aggressive, threatening, overbearing, and violent conduct, was sufficient to sustain the jury's determination of Martinez's specific intent at the time of the kidnapping. See Ratzlaf v. United States, 510 U.S. 135, 149 n.19 (1994) ("A jury may, of course, find the requisite knowledge on [the] defendant's part by drawing reasonable inferences from the evidence of [the] defendant's conduct . . . .").

\*        \*        \*        \*

For these reasons, we conclude that the evidence was sufficient to support the kidnapping for rape conviction.

IV.

Martinez claims that the Government violated his right to due process by questioning him on his post-arrest silence, in violation of the rule announced in Doyle v. Ohio, 426 U.S. 610 (1976). The facts underlying this claim are as follows. Martinez testified in his own defense that earlier in the day on June 16, 2003, Harvey asked him for $500 or $600 and said that if he gave her the money she "would make it worth [his] while." JA 338-39. Martinez testified that he understood this to mean that Harvey "wanted to have sex." JA 339. He then testified: (1) that the sexual episode later that evening was consensual; (2) that Harvey thereafter demanded the money she had requested; (3) that she threatened to tell everyone that he had raped her if he did not

16

provide the money; and (4) that when he did not give her the money, she accused him of rape.

The Government sought to dispel Martinez's exculpatory account on cross-examination. The prosecutor first asked: "Did you make a statement to Officer Berrios about what you told us here today?" JA 350. The trial court sustained defense counsel's objection, and before Martinez could answer, it interjected, "You don't have to answer." Id. After the prosecutor pressed Martinez as to whether Harvey had ever before requested money from him (Martinez admitted that she had not), this disjointed exchange ensued:

Q.     Did you ask Chenae if she had some type of problem that she would need this 5 or $600?

A.     No, sir.

Q.     Did you tell [Faye] Martinez that Chenae might be in some trouble and needed 5 or $600?

A.     No, sir.

Q.     Did you tell your mother that Chenae demanded 5 or $600 from you?

       [Defense Counsel]:  Objection, Your Honor.

       The Court:          Overruled.

Q.     Did you tell your mother that Chenae was trying to shake you down for 5 or $600?

       [Defense Counsel]:  Objection as to shake down.

       The Court:          Sustained.

17

Q.   Did you tell your mother that Chenae demanded 5 or $600 from you and said she would make it worth your while?

A.   No, sir.

Q.   Did you tell anyone other than today that Chenae demanded 5 or $600 from you?

[Defense Counsel]:  Objection, your Honor.

The Court:   Overruled.

Q.   Other than your attorney –

[Defense Counsel]:  Objection, your Honor.

The Court:   Sustained as to the attorney.

Q.   Did you tell anyone –

[Defense Counsel]:  Objection.   May we approach, Your Honor?

The Court:   You may.

JA 351-53.

At sidebar, defense counsel objected to the question whether Martinez had told "anyone" his story, but the trial court was unconvinced:

[Defense Counsel]:  Your Honor, the defendant has a right not to say anything to anyone, your Honor; has a right to remain silent. He has a right to privilege against self-incrimination. He has a

18

|  |  |
|---|---|
|  | right not to say anything. |
| The Court: | He has a right not to say anything to law enforcement officers, but – as I see it, the object of the government's [questions] is to indicate that the defendant recently made up the story. |
| [Defense Counsel]: | Well, that may very well be so if that's their object. If they can get it in, they can't get it in through this kind of questioning. He has a right not to say anything to anyone. |
| The Court: | I understand he has a right not to say anything to anyone, but they can ask him if he said it. |

JA 353. After the sidebar, this colloquy followed:

> Q.  Sir, did you tell anyone that Chenae demanded 5, $600 from you?
>
> A.  Excuse me, sir?
>
> Q.  Did you tell anyone that Chenae demanded 5 to $600 from you?
>
> A.  My attorney.

19

[Defense Counsel]:  I continue my objections.

The Court:          Yes.

JA 354.  The Government then moved to another line of questioning.

During his summation, the prosecutor challenged Martinez's story that Harvey had falsely implicated him of rape.  The prosecutor emphasized Martinez's admissions that he had never before flirted with Harvey and that Harvey had never before requested money from him.  Accordingly, the prosecutor argued, it would be nonsensical to believe that Harvey sought from her cousin money in exchange for sex out of the blue.  The prosecutor never referred, however, to the fact that Martinez had proffered his exculpatory account for the first time at trial, nor did he mention Martinez's post-arrest silence more generally.

"[P]articularly concerned" with the breadth of the prosecutor's questions whether Martinez had ever told "anyone" his exculpatory account, the Appellate Division held that the Government had violated Doyle.  JA 578.  But the court concluded that the constitutional error was harmless because "overwhelming" evidence existed such that "the jury could have determined that Martinez [took] Harvey away by threat or force with the intent to rape her."  JA 581.

Our review of this constitutional question is plenary.  Gov't of the V.I. v. Davis, 561 F.3d 159, 163 (3d Cir. 2009).  As we explain below, violations of Doyle are subject to harmless error analysis.  Accordingly, we ask first whether a violation occurred and, if it did, we ask whether it had an effect on the jury's verdict beyond a reasonable doubt.  See id.  We share the Appellate Division's concern with some of the prosecutor's questions.  We also agree, albeit for different reasons, that any Doyle violation was harmless beyond a reasonable doubt.

A.

Once a criminal defendant receives the prophylactic

20

warnings required by Miranda v. Arizona, 384 U.S. 436 (1966), it is improper under Doyle "for a prosecutor to cause the jury to draw an impermissible inference of guilt from a defendant's post-arrest silence." Hassine v. Zimmerman, 160 F.3d 941, 947 (3d Cir. 1998). This is so because Miranda warnings carry the Government's "implicit assurance" that an arrestee's invocation of the Fifth Amendment right to remain silent will not later be used against him. Davis, 561 F.3d at 163-64 (quoting Wainwright v. Greenfield, 474 U.S. 284, 290-91 (1986)); United States v. Johnson, 302 F.3d 139, 146 (3d Cir. 2002). Because a defendant's post-Miranda warning silence could be nothing more than an invocation of his right to silence, it would be fundamentally unfair to permit a breach of that assurance by allowing impeaching questions as to why he failed to give an exculpatory account to the police after receiving the warnings. See Davis, 561 F.3d at 163.[11]

Not every reference to a defendant's silence, however, results in a Doyle violation. Where "no governmental action induce[s] the defendant to remain silent," Fletcher v. Weir, 455 U.S. 603, 606 (1982), the Miranda-based fairness rationale does not control. Consequently, the Government permissibly may impeach a defendant's testimony using his pre-arrest silence, Jenkins v. Anderson, 447 U.S. 231, 240 (1980); his post-arrest, pre-Miranda warning silence, Fletcher, 455 U.S. at 605-07[12]; and any

_____

[11] The Government argues that Doyle is limited only to a defendant's silence immediately after receiving Miranda warnings, not to his general silence in the lead-up to trial. The Government argues that this case is controlled instead by Raffel v. United States, 271 U.S. 494, 496 (1926) (holding that Fifth Amendment "immunity from giving testimony is one which the defendant may waive by offering himself as a witness"), and that inquiry into Martinez's general pretrial silence was therefore proper. We rejected an identical argument in Davis, and therefore we need not address the claim at length here. See 561 F.3d at 164-65; accord Hassine, 160 F.3d at 947-49; United States v. Balter, 91 F.3d 427, 439 (3d Cir. 1996).

[12] The Government argues that Martinez failed to lay an evidentiary foundation that he received Miranda warnings, and accordingly that no Doyle violation occurred under Fletcher. It is

voluntary post-Miranda warning statements, Anderson v. Charles, 447 U.S. 404, 408-09 (1980). Additionally, under Greer v. Miller, 483 U.S. 756 (1987), "there may be no Doyle violation where the trial court sustains an objection to the improper question and provides a curative instruction to the jury, thereby barring the prosecutor from using the silence for impeachment." Davis, 561 F.3d at 164 (citing Greer, 483 U.S. at 764-65).

Having scrupulously reviewed the trial transcript, we share the Appellate Division's concern with some of the Government's questions. Referring to Martinez's exculpatory account, the prosecutor first asked: "Did you make a statement to Officer Berrios about what you told us here today?" JA 350. The prosecutor clearly sought by this question to undermine Martinez's story by highlighting his failure to tell the officer that same version at an earlier point in time. We cannot say with certainty, however, that the question was improper, because a crucial ambiguity exists in the record regarding Officer Berrios. Harvey's testimony on cross-examination reveals circumstantially that the officer took her statement at the hospital two days after the incident. JA 181-85, 189. But Officer Berrios did not testify at trial, and the record does not disclose what role he played in Martinez's arrest, or whether Martinez's failure to give the exculpatory story to him occurred before or after the arrest, or before or after Miranda warnings had been given.

Accordingly, we cannot discern whether the prosecutor's question was permissible under Jenkins, Fletcher, or Anderson on the one hand, or whether it violated Doyle on the other.[13] The

---

the Government, however, that bears the burden of establishing that no Miranda warnings were given if post-arrest silence is to be used. United States v. Cummiskey, 728 F.2d 200, 206 (3d Cir. 1984). Because it does not ultimately affect our disposition, we will assume arguendo that Martinez received the warnings.

[13] If the question was improper, the Supreme Court's decision in Greer does not cure it. While defense counsel immediately and successfully interposed an objection to the question (thus precluding Martinez's silence from actually being

22

context of the question and the lack of relevant evidence underlying it give us pause, and our analysis below is mindful of these uncertainties. Unable to answer definitively whether the question violated Doyle, we turn to the questions that Martinez centrally challenges on appeal – those in which the prosecutor asked whether Martinez had ever told "anyone" his exculpatory account.[14]

We also share the Appellate Division's concern that these questions "were overly broad and [their] breadth and obscurity affect the applicable review . . . ." JA 578. Because the prosecutor placed no personal or temporal specifications on the questions, they might well have been construed as targeting Martinez's post-arrest, post-Miranda warning failure to proffer his story to the police. See United States v. Dodd, 111 F.3d 867, 869 (11th Cir. 1997) (per curiam) ("A comment is deemed to be a reference to a defendant's silence if . . . it was of such a character that the jury would naturally and necessarily understand it to be a comment on a defendant's silence." (quotation marks omitted)).

The Appellate Division was hesitant to construe such open-ended and ambiguous questions against Martinez. So are we. Under the circumstances, we think that the prosecutor's questioning in this case approached the constitutional line, and likely crossed it. However, we need not decide definitively whether the Government's questions violated Doyle, because we will affirm the District Court's judgment even assuming that they

---

submitted to the jury, see Johnson, 302 F.3d at 147), the trial court failed to provide a curative instruction to the jury that it was not to consider Martinez's post-arrest silence against him. We have emphasized on several occasions the importance of such an instruction in order for Greer to apply. See Davis, 561 F.3d at 164; Johnson, 302 F.3d at 148 n.10; Hassine, 160 F.3d at 948. Additionally, the prosecutor went on to ask other potentially problematic questions.

[14] Martinez does not take issue with the questions regarding whether he told his story to Faye Martinez or his mother, and we therefore do not address them.

23

did. See United States v. Rodriguez, 43 F.3d 117, 122 (5th Cir. 1995) (assuming for the sake of argument that a Doyle violation occurred where the "prosecutor's questions were sufficiently broad as to be construed as commentary on [the defendant's] failure to come forward with his alibi (1) prior to arrest, (2) immediately after arrest and Miranda warnings . . . , and (3) during the time period prior to trial but following his arrest"); cf. United States v. Balter, 91 F.3d 427, 440 (3d Cir. 1996) (assuming arguendo that the prosecutor's questions violated Doyle and proceeding to harmless-error analysis).

B.

We hold that any Doyle violation here was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967) (holding that a constitutional error is harmless where it can be "prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"); Balter, 91 F.3d at 440 ("The Supreme Court has held 'that Doyle error fits squarely into the category of constitutional violations which [it] has characterized as trial error.'" (quoting Brecht v. Abrahamson, 507 U.S. 619, 629 (1993)) (alteration in Balter)).

Before explaining why, we pause to note that the Appellate Division's analysis suffers from the same deficiencies that we recently identified in Davis. The court held in this case that any Doyle error was harmless because "the evidence of Martinez'[s] guilt . . . was overwhelming" and accordingly that "even without the prosecutor's inappropriate question, the jury could have determined that Martinez [committed kidnapping for rape]." JA 581. By comparison, in Davis, the Appellate Division held that the Doyle error was harmless because there existed "significant evidence from which the jury could have found guilt." 561 F.3d at 165 (quotation marks omitted). Rejecting that formulation, we reminded the court that the relevant question under Chapman "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Id. (quoting United States v. Korey, 472 F.3d 89, 96 (3d Cir. 2007)). Our ensuing explanation applies equally here:

24

> [W]e are unsatisfied with this conclusion insofar as the Appellate Division focused on whether the evidence was sufficient to convict despite the error, as opposed to whether there was a reasonable possibility that the error contributed to the jury verdict. See Satterwhite v. Texas, 486 U.S. 249, 258-59 (1988) ("The question, however, is not whether the legally admitted evidence was sufficient . . . but rather, whether the [Government] has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (quoting Chapman, 386 U.S. at 24)).

Id. at 166. We are compelled to reiterate that constitutional harmless-error analysis is not merely a review of whether the jury "could have" returned a verdict absent the constitutional error. Such an analysis improperly conflates sufficiency-of-the-evidence review with the appropriate Chapman standard.

We are similarly unconvinced – as we were in Davis, see id. – that the evidence proffered against Martinez can be characterized as "overwhelming." Martinez did not dispute at trial that he took Harvey to the Salt River in his car, nor did he deny that he had sexual intercourse with her. Consequently, the central issue in the case concerned whether the episode was consensual, and thus it turned on the credibility of Harvey, Dawn Callwood, Faye Martinez, and the defendant. Although Callwood and Faye Martinez both testified that the defendant called them after the incident and implicated himself (thus corroborating Harvey's account and strengthening the Government's case), these witnesses were subject to rigorous cross-examination concerning their possible biases. See id. (highlighting the "close associations" between the three eyewitnesses whose testimony purportedly provided "overwhelming evidence" against the defendant). At bottom, a critical issue in the case largely required the jury to choose sides in a classic he-said, she-said contest. While we agree that the evidence was solid, we cannot agree with the Appellate Division that overwhelming evidence against Martinez alone rendered any error harmless.

The foregoing does not inexorably lead us to doubt that the prosecutor's questions played no part in the verdict here. While many of our Doyle cases focus on the quantum of evidence against the defendants, see, e.g., Balter, 91 F.3d at 440, harmless-error analysis must, by necessity, take into account the totality of the circumstances. We have never held, nor do we now, that the amount of incriminating evidence is the only factor implicated in a Doyle harmless-error analysis. Cf. Rodriguez, 43 F.3d at 123 (analyzing whether Doyle error was harmless in light of "the entire record"); United States v. Thomann, 609 F.2d 560, 566 (1st Cir. 1979) ("In the light of all the circumstances in this case . . . , we find that . . . [the error] was harmless and not grounds for reversal."). Under all of the circumstances presented by this case, two related factors ultimately convince us beyond doubt that any error did not affect the jury's verdict.

First is the garbled nature of the challenged colloquy between court, counsel, and witness. Compare United States v. Agee, 597 F.2d 350, 359 (3d Cir. 1979) (en banc) (finding any Doyle error harmless where the challenged question was ambiguous, and explaining that it was unlikely the jury "understood and recollected" the question as anything more than an innocuous reference), with Davis, 561 F.3d at 167 (finding Doyle error not harmless where the prosecutor's questions directly and clearly undermined the plausibility of the defense), and United States v. Curtis, 644 F.2d 263, 270-71 (3d Cir. 1981) (finding Doyle violation not harmless where the improper questions were "neither isolated nor ambiguous").

The challenged questions before the sidebar – which we have already described as overly broad and ambiguous – were either interrupted or immediately followed by objections from defense counsel (some the trial court sustained, some it overruled), preventing the jury from learning or inferring the answers to the questions and thus compounding the ambiguity surrounding them. The questions posed and the answers given after the sidebar were no clearer. Martinez himself needed the prosecutor to repeat his question, and he then referenced his attorney, provoking yet another immediate objection (on an altogether different basis), before the prosecutor promptly moved to another subject. The

prosecutor's open-ended questions and attempted questions, the barrage of intermittent objections and interruptions, the varying responses by the trial court, and the partial answers by the defendant all combine to obfuscate further what was already an unclear allusion to Martinez's post-<u>Miranda</u> warning silence. Having studied the transcript, we believe it is exceedingly unlikely that the jury was able to arrive at a negative inference based on the oblique and muddled manner in which Martinez's silence was put before them.

Second, while the challenged questions cannot be said to be "isolated" (as the prosecutor asked a number of times whether Martinez had told his story to "anyone"), <u>see</u> <u>Curtis</u>, 644 F.2d at 270-71; <u>Agee</u>, 597 F.2d at 359, the questions were plainly not a focal point of the cross-examination. In context, the questions were far from flagrant violations of <u>Doyle</u>, but instead came and went in relative passing. <u>See</u> <u>Davis</u>, 561 F.3d at 166 (looking to "the severity of the <u>Doyle</u> violation" when conducting the harmless-error analysis); <u>United States v. Scott</u>, 47 F.3d 904, 907 (7th Cir. 1995) (finding <u>Doyle</u> error harmless where references to post-arrest silence "were limited in their intensity and frequency").

The challenged questions here covered only a small fraction of the furious cross-examination covering multiple subjects and spanning twenty pages of the trial transcript, and were hardly the type of frontal assaults on post-arrest, post-<u>Miranda</u> warning silence that our Court and other courts have held not to be harmless. Additionally, the prosecutor not once referred to Martinez's post-arrest silence or the prior questions about it during summation. Instead, he attacked the veracity of the defendant's account only on the basis that it lacked consistency with his and Harvey's relationship and their conduct before the incident. This fact, in our view, is critical. <u>Compare</u> <u>Scott</u>, 47 F.3d at 907 (finding single improper reference during summation to be harmless), <u>and</u> <u>Agee</u>, 597 F.2d at 359 (noting that counsel did not refer during summation to an arguably improper reference to post-arrest silence), <u>with</u> <u>Davis</u>, 561 F.3d at 162, 167 (finding no harmless error where prosecutor repeatedly emphasized the defendant's post-arrest silence during summation), <u>and</u> <u>United States v. Cummiskey</u>, 728 F.2d 200, 204 (3d Cir. 1984) (finding

Doyle error not harmless, in part because "[t]he prosecutor emphasized Cummiskey's silence . . . both during the trial and extensively during closing argument." (emphasis added)).[15]

\*     \*     \*     \*

The challenged colloquy here was ambiguous and disjointed, and was riddled with interruptions and half-answers. The prosecutor did not highlight Martinez's silence, and after a passing moment he moved on, never referencing the point again. Under all of the circumstances here, we conclude that any error played no role in the jury's verdict. It was therefore harmless.

## V.

Martinez asserts two final claims on appeal: (1) that the trial court committed reversible error by admitting implicit and prejudicial hearsay during Harvey's testimony; and (2) that the trial court's jury instructions with respect to the kidnapping charge were impermissibly incomplete. A thorough review of the record convinces us that these claims are entirely without merit, and we reject them without further discussion.

---

[15] We recognize, of course, that in this case the trial court did not give an immediate curative instruction, for it did not recognize the potential problem that the questions posed. See Davis, 561 F.3d at 167 (explaining that "the absence of a curative instruction by the Territorial Court likely left the jury with the false impression that the prosecutor's references to Davis's silence . . . were appropriate"). We reiterate the manifest importance of immediate curative instructions whenever a defendant's post-Miranda warning silence is mentioned before the jury. We also emphasize that many Doyle violations will not be harmless precisely because the court did not provide an instruction. It is not the case, however, that a court's failure to give a curative instruction precludes in all cases satisfaction of the Chapman harmless-error standard. It is the vague and ultimately inconsequential nature of the violation that compels the result in this case.

28

## VI.

For the foregoing reasons, we will affirm the order of the Appellate Division.