**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2480
_____

JAMES WILLIAM MCBRIDE,
                                        Appellant

v.

SUPERINTENDENT, SCI HOUTZDALE;
THE DISTRICT ATTORNEY OF THE COUNTY OF
NORTHAMPTON;
THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 06-cv-02085)
District Judge:  Hon. Lowell A. Reed
_____

Argued
March 26, 2012

Before:   FUENTES, SMITH, and JORDAN, *Circuit Judges*.

(Filed: August 1, 2012)
_____

Jay H. Calvert, Jr.
Sarah E. Pontoski    [ARGUED]
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA   19103
        *Counsel for Appellant*

John M. Morganelli   [ARGUED]
Northampton County Office of
    District Attorney
669 Washington Street
Easton, PA   18042
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

James McBride appeals an order of the United States District Court for the Eastern District of Pennsylvania denying his petition[1] under 28 U.S.C. § 2254 for habeas corpus relief from a state murder conviction. McBride argues

_____

[1] The petition under review is the amended petition filed on McBride's behalf on January 15, 2008.

2

that his petition should have been granted because his constitutional right to effective assistance of counsel was violated when his counsel failed to object to various references the prosecutor made at trial to what McBride alleges were matters implicating his constitutional right to remain silent. For the following reasons, we will affirm.

## I. Background and Procedural History

### A. *Background*

McBride and his wife, Kelly McBride ("Kelly"),[2] hosted a party at their apartment on February 17, 1984. According to McBride, Kelly left their home the next morning and he did not see her again. She was reported missing in March 1984 by her parents and was never found. On May 25, 1984, Judith Seagraves, a neighbor of the McBrides, observed McBride's father and McBride's landlord removing a bloody mattress from the McBrides' apartment, so she called the police. When the police arrived, they searched the apartment and found a bureau which had been nailed shut. When they opened the bureau, they found that the inside had been removed, and they identified traces of blood and hair. In 1993, through the use of DNA technology, police were able to connect Kelly to the blood found on the mattress and the bureau seized from the McBrides' residence. On November 4, 1999, a grand jury convened to investigate Kelly's disappearance, and subsequently recommended charging McBride for Kelly's murder. Sixteen years after

---

[2] For simplicity, and meaning no disrespect by over-familiarity, we will refer to Kelly McBride by her first name.

Kelly's disappearance, McBride was arrested in Florida and charged with criminal homicide.

B.    *Procedural History*

1.    *Trial*

At McBride's trial in the Court of Common Pleas of Northampton County in Pennsylvania in May 2001, the district attorney made comments before the jury that arguably implicated McBride's constitutional right to remain silent. The district attorney made those comments, with no objection from McBride's counsel, when referring to interviews that McBride had had with Richard Fritz, an FBI agent, and Stephen Abbey, a corporal in the Rockledge, Florida Police Department.

a)    *Agent Fritz Interviews*

Agent Fritz testified that he interviewed McBride twice during May 1984, and he read to the jury from notes that he made during those interviews. Before Agent Fritz read his notes from the second interview,[3] defense counsel objected on hearsay grounds. The judge overruled that objection and gave a limiting instruction directing the jury to focus on McBride's reactions to Agent Fritz's questions:

_____

[3] Agent Fritz's first interview with McBride occurred on May 1, 1984, when McBride voluntarily appeared at the FBI office in Allentown, Pennsylvania to provide information regarding Kelly's disappearance. McBride does not argue that any notes read from that first interview implicated his constitutional right to silence.

4

> This information is being submitted to you for a limited purpose. … [I]t's being offered to you, and may be considered by you, only so that you can evaluate the effect on Mr. McBride when he hears these things. It's offered to show the effect on the listener, on the hearer. So when there is a reference in the upcoming interview about things other people said, you're not to focus on whether or not they actually said those things or whether or not those things are true. Rather, you're to focus on how, if at all, Mr. McBride reacts to that information.

(App. at 176-77.)

Agent Fritz then read his notes from a May 30, 1984 interview with McBride at the Lehigh County Prison, where McBride was incarcerated on an unrelated matter. Those notes indicated that, after *Miranda* warnings were given,[4] McBride answered certain questions that Agent Fritz posed to him, but he did not respond to others:

> When specifically asked whether he had been in the company of [name redacted] the day following his wife's disappearance, McBride would not answer.

---

[4] Specifically, Agent Fritz testified that McBride was "furnished an interrogation advised of rights form" and that "McBride stated he understood the form and its contents." (App. at 177.)

5

McBride was asked if he was aware of the fact that [what appeared to be] a large amount of blood … had been found on a mattress in his apartment. McBride would not respond.

McBride was asked whether he had any knowledge of a foot locker or a trunk previously located in his attic, and McBride stated he had no such knowledge. He was asked whether he knew where a sleeping bag of his was located, and he would not answer.

McBride was asked whether he had ever been involved in the assault or murder of his wife. McBride denied any such knowledge, indicated that he loved his wife. McBride was asked whether the blood located in his apartment could have been caused by the death of his wife or an assault on her person. McBride did not respond.

McBride then sat in complete silence for several moments and then indicated that he did not wish to continue the interview. McBride abruptly left the interview space, and the interview was terminated.

(*Id.* at 183-84.) Defense counsel did not object to that testimony.[5]

_____

[5] The topic of Agent Fritz's May 30, 1984 interview also arose when the district attorney cross-examined McBride:

Q. Now, Mr. Fritz says, when he was talking with you, on May 30th of 1984, McBride was asked whether he had been involved in the assault and murder of his wife, McBride denied any such knowledge, indicated he loved his wife, is that what you told him?

A. I don't recall, sir.

Q. McBride was asked whether the blood located in his apartment could have been caused by the death of his wife or an assault on his person, McBride did not respond, do you remember that?

A. No, sir, I don't.

Q. Is Agent Fritz wrong that you didn't respond when he asked you that?

A. I don't recall what I told Mr. Fritz.

(App. at 245-46.) Defense counsel did not object to that testimony either. In McBride's 56-page petition for post-conviction relief to the state court, *see infra* Part I.B.2, he made only a few passing references to that line of questioning. Indeed, it was so obscure that the state court appears to have missed it, as its 28-page opinion on McBride's post-conviction relief motion did not address that particular portion of the trial. *See id.* Assuming *arguendo* that McBride "fairly presented" in state court a claim related to that cross-examination, *see Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005) (describing "fairly presented" as meaning "that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted"

7

*b)*      *Officer Abbey Interview*

When McBride testified at trial, the district attorney cross-examined him regarding an interview with Officer Abbey that occurred after McBride's arrest in 2000. Having heard his *Miranda* rights, McBride had been willing to answer some of Officer Abbey's questions but not others. The district attorney and McBride sparred during cross-examination over just how much McBride had been willing to say in that interview:

> Q. Well, Mr. McBride, you agreed to talk to Officer Abbey, didn't you?

---

(citation and internal quotation marks omitted)), we would ordinarily review it *de novo*, since it was not "adjudicated on the merits," *Thomas v. Horn*, 570 F.3d 105, 117 (3d Cir. 2009). Here, however, McBride only references this colloquy in a footnote in his opening brief, and therefore has failed even to adequately raise the issue before us. *See United States v. Hoffecker*, 530 F.3d 137, 162 (3d Cir. 2008) (noting a "one-sentence footnote falls far short of meeting the requirement that an appellant raise an issue in his opening brief or else waive the issue on appeal"); *Laborers' Int'l Union of N.A. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue … will not suffice to bring that issue before this court." (citation and internal quotation marks omitted)). Accordingly, McBride has waived any claim related to this line of questioning, and we will not further address it.

A. No, I agreed to listen to him.

Q. You answered his questions?

A. A couple.

Q. What do you mean, a couple, do you want me to go through every question and answer in this tape?

A. If you like to, I don't really mind.

Q. You answered every one of his questions, didn't you?

A. Not every one, no.

(*Id.* at 240.) Defense counsel did not object to that testimony.

McBride was ultimately convicted of first degree murder and sentenced to life imprisonment, and that judgment was affirmed by the Superior Court of Pennsylvania. McBride's Petition for Allowance of Appeal to the Pennsylvania Supreme Court was denied.

## 2.  *PCRA Appeal*

McBride filed a *pro se* petition for post-conviction relief, and, following the appointment of counsel, filed an amended petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Const. Stat. §§ 9541-46, in the Court of Common Pleas (in the context of the PCRA claim, the "PCRA Trial Court"). He asserted that his trial counsel was ineffective for failing to object to the district attorney's references to his post-arrest silence. McBride's trial counsel

9

testified at a hearing before the PCRA Trial Court and was asked whether the direct examination of Agent Fritz regarding the May 30, 1984 interview with McBride implicated McBride's constitutional right to remain silent. He answered:

No, I disagree. First of all, Mr. McBride did not elect to remain silent. Mr. McBride had given a very extensive interview on May 1st, in which he had explained in detail to the same FBI agent[, Agent Fritz,] what he knew about it.

In the second interview [with Agent Fritz], Mr. McBride did not assert his Fifth Amendment right to remain silent, Mr. McBride answered questions. What I gathered from that and what I felt that the jury would gather from that is that when it shifted from asking questions to becoming essentially accusatory towards Mr. McBride, that Mr. McBride wisely – first of all, had no response and eventually said this interview is over and stopped speaking.

I did not believe that to be an improper comment on his assertion of a Fifth Amendment assertion. Rather, I felt it to be an example of how this investigation had proceeded or more to the point, not proceeded.

They were always looking at McBride, as best I could see, no matter what he said or

did and I thought it was a perfect example of how this had been badly investigated.

So I – in answer to your question, I'm sure that one could say that by not responding, as I recall the testimony to have been, or by not answering, he may have been asserting a Fifth Amendment right, although he doesn't specifically say that.

But it also, in my view, was a rather dramatic way to point out to the jury exactly what was happening here; namely, that within a matter of months, they were focusing on him, even though they had no reason to.

(App. at 273-74.)

McBride's PCRA counsel immediately asked McBride's trial counsel whether he would "agree, that the testimony, at the least, refers to post[-*Miranda*] silence." (*Id.* at 274.) McBride's trial counsel answered, "I believe it is a reference to post[-*Miranda*] silence, clearly." (*Id.* at 275.) He then noted:

Obviously, in retrospect, I wish that many things had gone differently in this case. [The reference to post-*Miranda* silence] may not have been as beneficial [as] I thought it was at the time. I would have to say, though, that at the time, this was a conscious decision to let Agent Fritz say what he was saying … .

11

(*Id.* at 277.)

McBride's PCRA counsel then asked McBride's trial counsel whether he believed the district attorney's line of questioning regarding Officer Abbey's interview during the cross-examination of McBride implicated post-*Miranda* silence, "although perhaps less directly." (*Id.* at 280.) He answered: "To the contrary. I think it's a question seeking to elicit a response from Mr. McBride that he had answered the questions put to him by Officer Abbey, that's the way that I understood that testimony." (*Id.*)

After the hearing, the PCRA Trial Court denied McBride's petition. Regarding the challenged references made during Agent Fritz's testimony, the PCRA Trial Court concluded that McBride had failed to prove that trial counsel was ineffective. Although the PCRA Trial Court found that McBride's "claim ha[d] arguable merit" (*id.* at 310), the Court said that, "[a]fter a review of the testimony and trial strategy," it could not conclude that trial counsel's "actions were without a reasonable basis to effectuate his client's interests" (*id.* at 311).[6] The Court went on to note that trial

---

[6] In rejecting the ineffective-assistance-of-counsel claim, the PCRA Trial Court applied a three prong test, citing to *Commonwealth v. Harris*, 852 A.2d 1168 (Pa. 2004); *see id*. at 1173 (citing *Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 1987)) ("To succeed on a claim that counsel was ineffective, an appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis for the act or omission in question; and (3) he suffered prejudice as a result of counsel's deficient performance, *i.e.*, there is a reasonable probability that, but

12

counsel "[was] a well known and very experienced criminal defense attorney" in the county and had "made some strategic choices in furtherance of the defense theme. The mere fact that [trial counsel's] trial strategy was ultimately unsuccessful does not render it unreasonable." (*Id*.)

Concerning the line of questioning that arose during cross-examination of McBride about his interview with Officer Abbey, the PCRA Trial Court concluded that the exchange "d[id] not implicate any post-arrest silence." (*Id.* at 314.) Rather, "[t]he record show[ed] that [McBride] knowingly and voluntarily waived his [*Miranda*] rights and agreed to answer the questions of … Abbey. The prosecution was merely conducting a cross-examination of [McBride] as to his voluntary responses to [those] questions." (*Id.*)

McBride appealed to the Superior Court (in the context of the PCRA claim, the "PCRA Appellate Court"), which affirmed the PCRA Trial Court's order. Although the PCRA Appellate Court found that McBride "raised an issue of arguable merit" regarding trial counsel's failure to object during Agent Fritz's testimony (*id.* at 392), and noted that "the reasonableness of counsel's choice not to object present[ed] a difficult question" (*id.* at 393), it concluded that McBride "suffered no prejudice from the testimonial references to his post-*Miranda* silence" (App. at 396). Because it rested its conclusion on lack of prejudice, the

for counsel's error, the outcome of the proceeding would be different."). We have held that the three prong test laid out in *Pierce* does not "contradict[] the Supreme Court's holding in *Strickland* [*v. Washington*, 466 U.S. 668 (1984)]." *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000).

PCRA Appellate Court did not analyze whether trial counsel's decision not to object during the direct examination of Agent Fritz was reasonable.[7] In concluding that there was "no reasonable possibility that the outcome of the trial would have been different absent Agent Fritz's testimonial references to [McBride]'s silence" (*id.*), the PCRA Appellate Court cited to what it thought were factual recitations from three witnesses at McBride's trial:

> In May, 1984, Judith Seagraves, a neighbor of the McBrides, called the Northampton Police to report that [McBride], [McBride]'s father Robert McBride, and [McBride]'s landlord were removing a bloody mattress from [McBride]'s apartment. …
>
> ….
>
> At [McBride]'s trial, Dawn DeLong testified that she was at the McBride's home one night in early 1984 and observed the couple "play fighting." At one point, [McBride] struck Kelly McBride, who fell and hit her head against a coffee table. DeLong stated that she saw no blood at the time, and that [McBride] carried Kelly upstairs. When DeLong went upstairs approximately one hour later to use the bathroom, she passed a bedroom where she saw

---

[7] The PCRA Appellate Court also did not discuss the district attorney's cross-examination of McBride regarding the Officer Abbey interview.

14

[McBride] holding Kelly. She observed that Kelly appeared unconscious, and that there was blood all over the mattress and Kelly's hair. DeLong testified that [McBride] seemed nervous and upset, and appeared to be trying to stuff Kelly's body into a dresser from which the drawers had been removed. [McBride] then asked DeLong to retrieve a knife from the kitchen, and she complied. DeLong testified that she also saw [McBride] retrieve a handsaw from the basement and return with it to the bedroom. DeLong testified that the last time she saw Kelly was when she saw [McBride] holding Kelly in the bedroom.

Another witness, Annette Beck, testified at trial that she had conversations with [McBride] regarding his marital status in 1987 and 1988. She stated that while [McBride] originally told her that his wife had left him and filed for divorce, he subsequently told her, on numerous occasions, that he had killed his wife. When Beck asked [McBride] where his wife's body was, he replied "where a back hoe wouldn't fit, use a shovel."

(*Id.* at 394-95 (internal citation omitted).)

Each of those recitations, however, contained significant mischaracterizations or omissions. First, Seagraves testified that only McBride's father and landlord were disposing of a bloody mattress on May 25, 1984, not McBride himself. In fact, it had been stipulated that McBride was incarcerated on unrelated charges on that date. Second,

15

DeLong never even testified at trial, but rather only at a preliminary hearing. Indeed, the Commonwealth did not call her as a witness at trial because it believed she had fabricated her preliminary hearing testimony. Finally, the PCRA Appellate Court failed to note that Beck said she understood McBride's alleged confession to be a joke.

Following the PCRA Appellate Court's decision, McBride filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania, which was denied.

### 3. *Post-Conviction Relief in Federal Court*

McBride subsequently filed in the United States District Court for the Eastern District of Pennsylvania a timely *pro se* petition for habeas relief pursuant to 28 U.S.C. § 2254. A magistrate judge recommended denial of the petition. After being appointed counsel, McBride was given the opportunity to file an amended petition, which he did.

The District Court denied McBride's petition for habeas relief. The Court first addressed the references to post-*Miranda* silence that arose during direct examination of Agent Fritz, concluding that "the state courts' ruling was not contrary to or an unreasonable application of federal law." (App. at 19.) Although the Court "[found] it troubling that trial counsel appear[ed] ambivalent about whether the testimonial references were improper or may have been the subject of a successful constitutional challenge," the Court "d[id] not believe that such a conclusion constitute[d] ineffectiveness *per se* in light of counsel's stated strategy of not challenging references to [McBride's] silence because

16

that testimony was consistent with his defense theory."[8] (*Id.* at 19-20.)

The District Court then turned to the line of questioning that arose during the cross-examination of McBride regarding his interview with Officer Abbey. The Court found that "the context of [McBride's] statement [was not] one in which jurors would equate invocation of Fifth Amendment rights with an implicit admission of guilt." (*Id.* at 28.) Therefore, the Court concluded that counsel's failure to object did not "fall outside of the wide range of professionally competent assistance." (*Id.* at 29 (citation and internal quotation marks omitted).) Accordingly, the Court issued an order denying the petition and refusing to grant a certificate of appealability ("COA"). We granted a COA "limited to the following issue: whether trial counsel rendered constitutionally ineffective assistance when he failed to object to references at trial to [McBride]'s constitutionally protected silence." (App. at 44.)

---

[8] Because the District Court found that "trial counsel['s] stated explanation of his trial strategy was constitutionally sufficient" (App. at 21), it did not address whether McBride was prejudiced by the challenged references. It did note, however, the mischaracterizations and omissions made by the PCRA Appellate Court, and did not rely on any of them in reaching its decision to deny habeas relief.

17

## II.     Discussion[9]

As already noted, McBride claims that his trial counsel was ineffective by failing to object to various references at trial that he alleges implicated his constitutional right to remain silent.  He argues that those failures were not "a result of any conscious decision or strategy, but because [his trial counsel] erroneously believed the testimony to be permissible." (Appellant's Br. at 22.)  McBride asserts that "because the state court incorrectly found … that [his] [t]rial [c]ounsel's unconscious, uninformed and unreasonable decision was not deficient and prejudicial," we should grant him habeas relief.  (*Id.* at 23.)  Before we can opine on that argument, we must first consider the analytical context provided by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), by *Strickland v. Washington*, 466 U.S. 668 (1984), and by the Fifth Amendment.

### A.     *AEDPA*

The parties agree that we are bound by the standards of AEDPA, under which a federal court may not grant a writ of habeas corpus with respect to a claim that was adjudicated on the merits in state court proceedings unless the state courts' adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

---

[9] The District Court had jurisdiction over McBride's amended petition pursuant to 28 U.S.C. § 2254.  We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253 and, because the District Court did not conduct an evidentiary hearing, our standard of review is plenary.  *McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009).

18

Federal law, as determined by the Supreme Court of the United States."[10]  28 U.S.C. § 2254(d)(1).  Also, under the

---

[10] "[A]n adjudication on the merits can occur at any level of state court." *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009) (internal quotation marks omitted).  Here, the PCRA Trial Court affirmed on the basis that trial counsel's performance was not constitutionally deficient, and the PCRA Appellate Court affirmed due to a lack of prejudice, without ruling explicitly on the performance prong of *Strickland*.  On the basis of our opinion in *Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008), it can be argued that each of those rulings was the last reasoned opinion of a state court reaching the merits of a particular prong of *Strickland* and that we must therefore consider both of them under the deferential AEDPA standard. *See id.* at 289 (reviewing the Pennsylvania Supreme Court's decision on PCRA review for the first prong of the *Strickland* analysis, but reviewing the PCRA trial court's decision for *Strickland*'s second prong).  It can also be argued, however, that this case differs from *Bond* in that we noted there that the state appellate court "agreed" with the PCRA trial court's denial of relief, *id.* at 284; *Commonwealth v. Bond*, 819 A.2d 33, 45 (Pa. 2002) ("We find no error in the PCRA [trial] court's denial of relief"), while in this case the state appellate court did not adopt, incorporate, or embrace the PCRA Trial Court's reasoning.  It only noted that the performance prong "presents a difficult question."  (App. at 393.)

We do not have to resolve the meaning of *Bond* in this case, however, because McBride has affirmatively taken the position that AEDPA deference applies.  (*See* Appellant's Br. at 20 ("Mr. McBride's habeas petition is governed by [AEDPA]."); *id.* at 24 ("Because the state court unreasonably applied *Strickland* to the facts of this case, a writ of habeas

corpus should issue.").) Because McBride "has not argued that § 2254(d) is entirely inapplicable to his claim or that the state court failed to reach an adjudication on the merits," we proceed to "evaluate his claim through the deferential lens of § 2254(d)." *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009) (applying AEDPA deference to petitioner's claim because, before the Supreme Court, he "contend[ed] that the Court of Appeals correctly applied § 2254(d) to his claim," despite his having previously, before the court of appeals, "contended that the standard of review set forth in § 2254(d)(1) should not apply to his case"); *Childers v. Floyd*, 642 F.3d 953, 967 n.15 (11th Cir. 2011) (en banc) (noting that "the Supreme Court has suggested that habeas petitioners can waive [his or her right to argue that a state court decision was not an adjudication on the merits]" (citing *Knowles*, 556 U.S. at 121 n.2)). Thus, regardless of whether we are required to give AEDPA deference to the PCRA Trial Court's analysis of the performance prong, we do give it deference as a reasoned analysis to which McBride has acknowledged AEDPA applies. *Cf. Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (stating that we "must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then … must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]").

We are thus spared the need to delve into the complicated question of what effect, if any, the Supreme Court's recent decision in *Harrington v. Richter*, 131 S.Ct. 770, has had on the teachings from *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), *Rompilla v. Beard*, 545 U.S. 374, 390 (2005), and *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009).

In holding that an unexplained state court decision must be accorded AEDPA deference, *Richter* observed that "§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated," regardless of "whether or not the state court reveals which of the elements in a multipart claim it found insufficient." 131 S. Ct. at 784. That observation arguably undermines the principle from *Wiggins* and its progeny that instructs that *de novo* review should apply to a particular prong of *Strickland* "when neither of the state courts below reached [that particular prong]." *Wiggins*, 539 U.S. at 534; *Rompilla*, 545 U.S. at 390 ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*." (internal citation omitted)); *Porter v. McCollum*, 130 S. Ct. at 452. That issue – whether *Wiggins* and related cases can co-exist with *Richter* – appears to be generating some conflict among our sister circuits. *Compare Childers*, 642 F.3d at 969 n.18 ("Language in [*Richter*] … suggests that [the principle of reviewing a component of a claim that was not adjudicated on the merits de novo] may no longer be good law"), with *Sussman v. Jenkins*, 642 F.3d 532, 534 (7th Cir. 2011) (one-judge order denying motion to stay) ("[T]he Supreme Court in [*Richter*] did not disturb its approach in *Wiggins* … [and] [w]e certainly cannot assume that the Court overruled *sub silentio* its holding in *Wiggins* – a precedent so important to the daily work of the lower federal courts.") and *Rayner v. Mills*, __ F.3d __, 2012 WL 2855803, *3-4 (6th Cir. July 12, 2012) ("The *Wiggins* and *Rompilla* line of cases work together with [*Richter*] to ensure application of AEDPA deference to an entire ineffective assistance claim."). Our own views on the

21

AEDPA standard, the "[s]tate court[s'] relevant factual determinations are presumed to be correct unless the petitioner rebuts [that] presumption by clear and convincing evidence." *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)).

Since McBride does not assert that the state courts' adjudication was contrary to Supreme Court precedent, but rather contends only that the state courts unreasonably applied that precedent, we will focus only on the "unreasonable application" prong of § 2254(d)(1). In other words, to obtain habeas relief, McBride "must show that the state court[s'] ruling on the claims being presented in federal court was so lacking in justification [under Supreme Court precedent] that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Id.* at 786 (alteration in original) (citation and internal quotation marks omitted). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." *Id.* (citation and internal quotation marks omitted). In the end, "[i]f this

possible tension between these Supreme Court precedents can be expressed on another day.

standard is difficult to meet, that is because it was meant to be." *Id.*

### B. Strickland *and AEDPA*

McBride specifically asserts that the state courts unreasonably applied *Strickland v. Washington* to the facts of his case. In *Strickland*, the Supreme Court held that every criminal defendant has a Sixth Amendment right to "reasonably effective [legal] assistance." 466 U.S. at 687. To succeed on an ineffective assistance of counsel claim, McBride must show that his "counsel's performance was deficient," *id.*, that is, he must prove that "counsel's representation fell below an objective standard of reasonableness," *id.* at 688. In scrutinizing counsel's performance, we "must be highly deferential," and refrain from "second-guess[ing] counsel's assistance after conviction or adverse sentence, [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. We must "eliminate the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Deficient performance can only be found when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed … by the Sixth Amendment."[11] *Id.* at 687.

---

[11] Even after establishing deficient performance, a defendant must also show that the "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. To prove prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the

23

The Supreme Court in *Richter* discussed how to assess a *Strickland* claim in the AEDPA context:

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Counsel's deficient performance must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

As discussed *supra* note 10, the PCRA Appellate Court did not address the performance component of *Strickland*, because it determined that McBride could not show that counsel's performance prejudiced him. Although the PCRA Appellate Court's prejudice is, unfortunately, marred by serious mischaracterizations of the record, we agree with our concurring colleague that "we still owe the [PCRA Appellate Court's] holding deference if it applied *Strickland* reasonably." (Concurrence Slip Op. at 1.) *See Richter*, 131 S. Ct. at 784 (stating that § 2254 "applies when a 'claim,' not a component of one, has been adjudicated"); *see also supra* note 10. Unlike our concurring colleague, however, we do not think the question of whether "McBride was … sufficiently prejudiced by the introduction of testimony that referenced [his] silence during interrogation" (Concurrence Slip Op. at 1) can readily be answered one way or another, and do not believe that we can assume that the PCRA Appellate Court would have come to the same conclusion that it did had it understood the facts correctly. We need not delve into that speculation, though, because we accord AEDPA deference to the PCRA Trial Court's analysis of the performance prong, *see supra* note 10, and that analysis cannot readily be doubted under that statute's stringent standards, *see infra* note 13 and accompanying text.

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 131 S. Ct. at 785 (internal citation and quotation marks omitted). The *Richter* court noted that even under a *de novo* review of *Strickland*, counsel's representation should be judged under a "most deferential" standard because, "[u]nlike a later reviewing court, [trial counsel] observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Id.* at 788. In that light, the *Richter* court held that, under AEDPA, *Strickland*'s "high bar" becomes even more difficult to surmount:

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d)

25

are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations and quotation marks omitted).

### C.     *Constitutional Right to Silence*

Because McBride asserts that his trial counsel was ineffective by failing to object to certain references to his silence – references that he alleges were in violation of his constitutional right to remain silent – we must consider as a threshold matter when the constitutional right to silence is implicated. "The Fifth Amendment, which applies to the States by virtue of the Fourteenth Amendment provides that '[n]o person … shall be compelled in any criminal case to be a witness against himself.'" *Maryland v. Shatzer*, 130 S. Ct. 1213, 1219 (2010) (alteration in original) (quoting U.S. Const. amend. V). Warnings provided by law enforcement officials pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), provide "a prophylactic means of safeguarding Fifth Amendment rights." *Doyle v. Ohio*, 426 U.S. 610, 617 (1976); *see id.* at 619 (concluding that the use of a defendant's post-*Miranda* silence to impeach that defendant's

26

exculpatory testimony violated the Due Process Clause of the Fourteenth Amendment).  We have explained that:

> Once a criminal defendant receives the prophylactic warnings required by *Miranda* …, it is improper under *Doyle* for a prosecutor to cause the jury to draw an impermissible inference of guilt from a defendant's post-arrest silence.  This is so because *Miranda* warnings carry the Government's implicit assurance that an arrestee's invocation of the Fifth Amendment right to remain silent will not later be used against him. Because a defendant's post-*Miranda* warning silence could be nothing more than an invocation of his right to silence, it would be fundamentally unfair to permit a breach of that assurance by allowing impeaching questions as to why he failed to give an exculpatory account to the police after receiving the warnings.

*Virgin Islands v. Martinez*, 620 F.3d 321, 335 (3d Cir. 2010) (internal citations and quotation marks omitted).[12]

---

[12] In *Martinez*, the defendant, charged with kidnapping for rape, testified that the sexual encounter at issue was consensual and that his victim threatened to tell others that he raped her unless he gave her money.  620 F.3d at 333.  "The government sought to dispel Martinez's exculpatory account on cross-examination," asking him whether he had previously made a similar statement to an officer involved in arresting him, *id.*, or "anyone" else, *id.* at 333-34.  Martinez alleged that line of questioning violated *Doyle*.  *Id.* at 335.  We could

"Not every reference to a defendant's silence, however, results in a *Doyle* violation." *Id.* Here, McBride answered some of the questions posed to him subsequent to receiving *Miranda* warnings, but selectively chose not to answer others. Many courts characterize this issue as partial or selective silence and have differing views on whether such silence should be admissible at trial against a defendant. While we have never considered the issue, some of our sister circuits have held that *Miranda* and *Doyle* protect a defendant's partial or selective silence from being used against him at trial. *See Hurd v. Terhune*, 619 F.3d 1080, 1087 (9th Cir. 2010) ("A suspect may remain selectively silent by answering some questions and then refusing to answer others without taking the risk that his silence may be used against him at trial."); *United States v. May*, 52 F.3d 885, 890 (10th Cir. 1995) ("[R]ecogniz[ing] that when a

---

not "discern whether [the] question [regarding the defendant's statements to the officer]… violated *Doyle*" because that officer "did not testify at trial, and the record [did] not disclose what role he played in Martinez's arrest, or whether Martinez's failure to give the exculpatory story to him occurred before or after the arrest, or before or after *Miranda* warnings had been given." *Id.* at 336. Concerning the question "whether Martinez had ever told 'anyone' his exculpatory account," *id.*, we "[thought] that … questioning … approached the constitutional line, and likely crossed it," *id.* at 337. However, we did "not decide definitively whether the [g]overnment's questions violated *Doyle*, because" we concluded that "any *Doyle* violation … was harmless beyond a reasonable doubt." *Id.* Thus, any observations that we made in *Martinez* regarding *Doyle* were not necessary to our decision.

defendant is 'partially silent' by answering some questions and refusing to answer others, this partial silence does not preclude him from claiming a violation of his due process rights under *Doyle*."); *United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995) ("[A] suspect may speak to the agents, reassert his right to remain silent or refuse to answer certain questions, and still be confident that *Doyle* will prevent the prosecution from using his silence against him."). Other circuit courts, however, have held that a defendant has no constitutional right to prevent his selective silence from being used against him at trial. *See United States v. Pando Franco*, 503 F.3d 389, 397 (5th Cir. 2007) ("[C]onclud[ing] that[,] by answering … questions after having knowingly received proper *Miranda* warnings, [the defendant] waived his right to [prevent] the entire conversation, including the implicit references to his silence contained therein, [from being] used against him as substantive evidence of guilt."); *United States v. Burns*, 276 F.3d 439, 442 (8th Cir. 2002) ("[T]he admission of [the defendant's] silence in response to one question posed to him in the midst of his interrogation was [not] a violation of the Supreme Court's holding in *Doyle*."). *Cf. United States v. Andujar-Basco*, 488 F.3d 549, 556 (1st Cir. 2007) (distinguishing *Burns* on the basis that "the challenged testimony [at issue in *Burns*] mentioned only the defendant's refusal to answer further questions," whereas "the challenged testimony [at issue in *Andujar-Basco*] refer[red] directly to [the defendant's] express assertion of his constitutional rights," because "although silence may be interpreted in many ways …, the affirmative assertion of the privilege against self-incrimination raises a clear inference of culpability" (internal citation omitted)). In short, it cannot be said that "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),

29

prevents a defendant's selective silence from being used against that defendant at trial.[13]

---

[13] In light of those differing views, we cannot agree with our concurring colleague that McBride's trial counsel necessarily "could [have made] a successful constitutional objection at trial" regarding the admission of McBride's statements. (Concurrence Slip. Op. at 1.)

That is particularly true, given the Supreme Court's statement in a habeas case that "an accused who wants to invoke his or her right to remain silent [must] do so unambiguously." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010). In *Thompkins*, the defendant, after receiving *Miranda* warnings, remained largely silent during an interrogation that lasted approximately three hours. *Id.* at 2256. About two hours and 45 minutes into that interrogation, however, Thompkins made inculpatory statements. *Id.* at 2257. Prior to trial, he moved to suppress those statements, arguing "that he had invoked his Fifth Amendment right to remain silent, requiring the police to end the interrogation at once." *Id.* The trial court denied that motion and Thompkins was subsequently convicted, and that conviction was affirmed on direct appeal. *Id.* at 2257-58. After he filed a habeas petition, the district court denied relief, but the United States Court of Appeals for the Sixth Circuit reversed, holding "that the state court was unreasonable in finding an implied waiver." *Id.* at 2258. The Supreme Court reversed the Sixth Circuit. Because Thompkins "did not say that he wanted to remain silent or that he did not want to talk," but rather just remained silent, the Supreme Court concluded that "he [had] not invoke[d] his right to remain silent." *Id.* at 2260. Therefore, the Court held that police could further interrogate him, and, since the Court

30

D.      *Analysis of* Strickland *Claim Under AEDPA*

McBride argues that trial counsel's failure to object to numerous references that may have implicated his constitutional right to remain silent fell outside of the wide range of professional competent assistance contemplated in *Strickland*, because, according to McBride, his trial counsel "clearly did not make a strategic decision to allow the jury to hear references to [those] silences." (Appellant's Br. at 26.)

---

also held that Thompkins waived his right to remain silent by his subsequent inculpatory statements, such statements were properly admitted at trial. *Id.* at 2260-64. In light of *Thompkins*' holding that a defendant's silence during an interrogation does not invoke his or her right to silence, the circumstances in which simply remaining silent suffices to prevent that silence from being used at trial under the *Doyle* rule are not free from doubt. *But cf. Doyle*, 426 U.S. at 617-18 ("Silence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of … [*Miranda*] rights. ... Moreover, while it is true that the [*Miranda*] warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings."); *Hurd*, 619 F.3d at 1088 (finding that "*Thompkins* stands for the proposition that a voluntary confession should not be suppressed just because a defendant has refrained from answering other questions," but noting that *Thompkins* "does not alter the fundamental principle that a suspect's silence in the face of questioning cannot be used as evidence against him at trial, whether that silence would constitute a valid invocation of the 'right to cut off questioning' or not" (quoting *Thompkins*, 130 S. Ct. at 2260)).

Under AEDPA, our review asks whether the PCRA Trial Court's determination – that trial counsel's actions were not without a reasonable basis – "was so lacking in justification that there was an error well understood and comprehended in existing [Supreme Court precedent] beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87. The PCRA Trial Court's decision was not so lacking here.

1. *Agent Fritz*

Regarding the direct examination of Agent Fritz, the PCRA Trial Court determined that trial counsel's decision not to object to references to McBride's post-*Miranda* silence by Agent Fritz was not "without a reasonable basis to effectuate his client's interests." (App. at 311.) McBride argues that that conclusion is unsound because trial counsel "did not even know that [McBride] had effectively asserted his Fifth Amendment right, that testimony about it was impermissible, and that he could and should have objected." (Appellant's Br. at 28.) In short, he says there was not a "'strategic' decision not to object." (*Id*.)

As an initial matter, it is debatable whether the admission of the disputed references to McBride's selective silence was a violation of *Miranda* or *Doyle*.[14] *See, e.g.*, *Burns*, 276 F.3d at 442 ("[W]here the accused initially waives his or her right to remain silent and agrees to questioning, but subsequently refuses to answer further questions, the

---

[14] It may also be debatable whether McBride ever asserted his right to remain silent to prevent the challenged references from being used against him at trial in contravention of *Miranda*. *See supra* note 13.

32

prosecution may note the refusal because it now constitutes part of an otherwise admissible conversation between the police and the accused." (citation and internal quotation marks omitted)). Thus, although the District Court found it "troubling that trial counsel [at the PCRA hearing] appear[ed] ambivalent about whether the testimonial references were improper or may have been the subject of a successful constitutional challenge"[15] (App. at 19-20; *compare id.* at 273 ("Mr. McBride did not assert his Fifth Amendment right to remain silent," and "I did not believe that to be an improper comment on his assertion of a Fifth Amendment right.") *with id.* at 274 ("I'm sure that one could say that by not responding , … or by not answering, he may have been asserting a Fifth Amendment right, although he doesn't specifically say that.")

---

[15] At oral argument, counsel for Appellees, for the first time, alerted us to a pre-trial motion to suppress filed by McBride's trial counsel that, Appellees allege, supports the assertion that trial counsel was aware that statements to be used at trial from certain interviews McBride had with law enforcement may have implicated post-*Miranda* silence. Considering each party's letters submitted pursuant to Federal Rule of Appellate Procedure 28(j), as well as a supplemental appendix provided by McBride's appellate counsel, it appears that trial counsel only moved to suppress affirmative statements made by McBride during the Officer Abbey interview. There is no indication from that motion to suppress, the related briefs, or the state court's order denying the motion to suppress, that McBride's trial counsel was aware that the references now at issue – either in the Agent Fritz interview or in the Officer Abbey interview – implicated post-*Miranda* silence. Accordingly, we do not rely on that motion to support our holding here.

33

*and id.* at 275 ("I believe it is a reference to post[-*Miranda*] silence, clearly.")), there is at least a reasonable argument that such references may not have even been constitutionally impermissible.[16]

In that light, we also note that trial counsel emphatically asserted at the PCRA hearing that his decision not to object to those references was a part of his trial strategy. (*See id.* at 273 (noting that "what … the jury would gather from that [testimony] [was] that when it shifted from asking questions to becoming essentially accusatory toward Mr. McBride, that Mr. McBride wisely … had no response and eventually said this interview is over and stopped speaking"); *id.* at 274 ("[The testimony] was a rather dramatic way to point out to the jury what was happening here; namely, that within a matter of months, they were focusing on him, even though they had no reason to."); *id.* at 276 (noting that he did not object because he "believed … it was part of the theory of the defense that the prosecution hadn't really looked much further than James McBride ever"); *id.* at 278 ("[W]hile in retrospect I'm not entirely comfortable with the decision, it was a decision that fit the defense theme.").) Indeed, the PCRA Trial Court found that trial counsel "made some strategic choices in furtherance of the defense theme"

---

[16] Because there is a reasonable argument that not all references to post-*Miranda* silence result in a *Doyle* violation, it may not be inconsistent to say that the references implicate post-*Miranda* silence and, at the same time, say that they are not constitutionally impermissible. We neither endorse nor refute such a contention but note it as pertinent to the question of whether the PCRA Trial Court unreasonably applied *Strickland*.

(*id.* at 311), a factual finding that we are bound to presume is correct because McBride has not rebutted it by clear and convincing evidence.[17]  *See* 28 U.S.C. § 2254(e)(1).  Even though trial counsel's strategy was ultimately unsuccessful, we must "eliminate the distorting effects of hindsight," and "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  Recognizing that "the standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, [our] review [should be] doubly so," there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard."[18]

---

[17] We acknowledge, generally, that if a defendant's trial counsel is completely unaware that an obvious constitutional violation has occurred, it would be difficult to give the proper weight to a state court factual finding that justifies such deficiency by finding that trial counsel's decision not to object was part of a trial strategy.  Here, however, it is not clear whether counsel was attuned to the constitutional issue, and, in that context, we must accord proper deference to the factual finding of the PCRA Trial Court that counsel made a strategic decision not to object.

[18] McBride downplays the highly deferential standard under which we review this claim, and cites to two pre-AEDPA cases from our circuit that deal with an ineffective assistance of counsel allegation regarding failure to object to post-*Miranda* silence in the habeas context to support why we should grant relief here.  First, he distinguishes his case from *Moore v. Deputy Commissioner(s) of SCI-Huntingdon*, where we found counsel were not ineffective because they "were well aware that the references to post-arrest silence were improper," but made "a conscious determination as to how to

35

*Richter*, 131 S. Ct. 788 (internal citations and quotation marks

proceed," 946 F.2d 236, 246 (3d Cir. 1991), whereas here, McBride alleges, no such conscious determination was made. Instead, he argues that the facts in *Boyer v. Patton* are analogous to his case. 579 F.2d 284 (3d Cir. 1978). In *Boyer*, a pre-*Strickland* case, trial counsel admitted "that he could not recall any specific reason for his failure to challenge" testimony that violated his client's Fifth Amendment right to silence. *Id.* at 285. We found that counsel's failure to object to a reference to post-arrest silence, which trial counsel noted "might well be objectionable," *id*. at 285 (internal quotation marks omitted), fell below "the standard of adequacy of legal services, … [which was] the exercise of the customary skill and knowledge which normally prevails at the time and place," *id.* at 286 (citation and internal quotation marks omitted).

To analyze whether trial counsel's failure to object here is more akin to *Moore* or *Boyer* misses the point. Rather, it is imperative to note that our standard of review in *Moore* was less deferential than is now required, *see Moore*, 946 F.2d at 246 (*de novo* review under *Strickland*), and, in *Boyer*, even less so, *see Boyer*, 579 F.2d at 286 (whether attorney "exercise[d] … the customary skill and knowledge which normally prevails at the time and place" (citation and internal quotation marks omitted)). None of the state court decisions in those cases were accorded nearly the level of deference that more current precedent demands. *See Richter*, 131 S. Ct. at 788 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

36

omitted). Accordingly, the PCRA Trial Court's determination here was not an unreasonable application of *Strickland*.

## 2. *Officer Abbey*

The PCRA Trial Court also determined that trial counsel's failure to object to a line of cross-examination questions regarding McBride's interview with Officer Abbey did "not implicate any post-arrest silence" as "[t]he prosecution was merely conducting a cross-examination of [McBride] as to his voluntary responses to [those] questions." (App. at 314.) McBride disagrees, asserting that "this questioning clearly refers to post-*Miranda* silence" because "the [district attorney] obviously knew that McBride did not answer every question [posed by Officer Abbey]," and McBride's admission that he had not done so "served the [district attorney's] purpose of emphasizing his post-*Miranda* silence." (Appellant's Br. at 32.) Therefore, McBride claims, trial counsel's decision not to object "f[ell] below the standard expected of competent counsel." (*Id.*)

Under the "highly deferential" *Strickland*-plus-§ 2254(d) "tandem" review, *Richter*, 131 S. Ct. at 788, there was at least a reasonable argument that trial counsel's actions were within the "wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690. Trial counsel testified at the PCRA hearing that he did not object to the line of questioning in dispute because he believed that it sought "to elicit a response from Mr. McBride that he had answered questions put to him by Officer Abbey." (App. at 280.) Indeed, when cross-examining Officer Abbey, trial counsel emphasized that McBride had repeatedly denied to Officer

37

Abbey that he participated in any wrongdoing involving his wife. (*See* Notes of Testimony 5/10/01 at 96 ("Q. In fact, when specifically asked repeatedly as many different ways as you could, what he said was, I didn't do it, right? A. That's correct.").) Thus, it could be reasonably argued that the cross-examination of McBride regarding his interview with Officer Abbey was, as the District Court stated, "focused on [McBride's] responses, and not [McBride's] silence," and therefore did not implicate any constitutionally impermissible inference of guilt. (App. at 28.) Accordingly, the PCRA Trial Court's finding that such references "[did] not implicate any post-arrest silence" (App. at 314), and its implicit conclusion that trial counsel did not act unreasonably by not objecting, was not an unreasonable application of *Strickland*.

### III.    Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.

FUENTES, *Circuit Judge* concurring:

I concur with my colleagues that McBride's habeas petition must be denied. I, however, would not reach the troubling question of whether a counsel who appeared unaware that he could make a successful constitutional objection at trial made a reasonable strategic choice. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.") Rather, I think that McBride failed to demonstrate that he was prejudiced under *Strickland* since he cannot demonstrate that there is a "substantial" likelihood the jury would have returned a verdict of not guilty. *See Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770, 792 (2011). The Pennsylvania Superior Court relied on an inaccurate description of the facts in determining that there was no prejudice. While we owe those factual determinations no deference, we still owe the court's holding deference if it applied *Strickland* reasonably. *Id.* at 785. Despite the state court's errors, it reasonably held that McBride was not sufficiently prejudiced by the introduction of testimony that referenced his silence during interrogation.

These references would have been seen by the jury as an implicit admission of guilt, *Virgin Islands v. Martinez*, 620 F.3d 321, 335 (3d Cir. 2010), but there was ample other evidence of his guilt. Three other witnesses testified that McBride admitted to killing Kelly, and there was circumstantial physical evidence that linked McBride to the crime. Thus, it is difficult to conclude that there is a "substantial" likelihood that the jury would have found

differently if his confession-by-silence was excluded. *See Delgadillo v. Wodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (holding that petitioner was not prejudiced when "largely cumulative" improper testimony was admitted). For this reason, I would hold that McBride was not prejudiced and that thus his ineffective assistance of counsel claim fails. Therefore, I respectfully concur.